

Susan Ritz (1076)
Ritz Clark & Ben-Asher LLP
40 Exchange Place, Suite 2010
New York, NY 10005
212-321-7075
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X          11 Civ. 0296 (WHP)
DEBORAH SUSS ESPOSITO,

         Plaintiff,       FIRST AMENDED
                  COMPLAINT WITH
  -against-             JURY DEMAND

EXENET LLC; EXENET HOLDINGS LLC;
EXENET TECHNOLOGIES, INC.; BEDROC
PARTNERS, LLC; COMGROUP HOLDING LLC
d/b/a ALPHASERVE TECHNOLOGIES;
DAVID GENTILE; BERNARD PISMENY
and ROBERT KESSLER,

         Defendants.
-----------------------------------------------------------------X

   DEBORAH SUSS ESPOSITO ("Plaintiff or Esposito"), through her attorneys,

Ritz Clark & Ben-Asher LLP, complaining of defendants EXENET LLC, EXENET

Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, COMGroup Hold-

ing LLC d/b/a Alphaserve Technologies, David Gentile, Bernard Pismeny and Robert

Kessler ("collectively referred to as "Defendants"), hereby alleges:


## NATURE OF ACTION

1.  This action arises out of an extended period of sex discrimination, pregnancy dis-

crimination and retaliation, culminating in the discriminatory and retaliatory termination

of Plaintiff's employment.  It is brought to recover money damages for unlawful dis-

crimination and retaliation, failure to pay earned commissions, and breach of contract,

together with all available equitable remedies, for actions committed by Defendants, acting in concert:

(i)      in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.*, as amended by, among others, the Civil Rights Act of 1991 ("Title VII"); and

(ii)     in violation of the New York City Human Rights Law, NYC Admin. Code §§8-101 *et seq.* ("NYC HRL"); and

(iii)    in violation of New York Labor Law §191 and 193.

2.      Plaintiff seeks declaratory and injunctive relief; compensatory, punitive and liquidated damages;  lost wages, commissions and benefits; costs and attorneys' fees and all other appropriate legal and equitable relief.

## JURISDICTION AND VENUE

**3.**     Jurisdiction of this Court is invoked pursuant to 42 U.S.C. §§2000e-5(f) and (g) and 28 U.S.C. §§1331, 1343 (a) (4), 2201 and 2202.  Jurisdiction over the state claims and the pendent parties is invoked pursuant to 28 U.S.C. §1367 and the Court's pendent jurisdiction.

4.      Venue is found in the Southern District of New York pursuant to 28 U.S.C. §1391(b) and 42 U.S.C. §2000e-5(f)(3).

5.      On or about March 12, 2010, Plaintiff timely filed charges of sex and pregnancy discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") against defendants EXENET LLC and EXENET Holdings LLC.

2

6.     On or about June 18, 2010, Plaintiff filed amended charges adding defendants BedRoc Partners, LLC and Exenet Technologies, Inc. as respondents.

7.     On or about August 18, 2010, Plaintiff filed additional amended charges naming COMGroup Holding LLC  (a/k/a COMGroup East) and Alphaserve Technologies as respondents.

8.     On or about October 20, 2010, the EEOC issued a notice of right to sue letter, which was received by Plaintiff on or about October 21, 2010.

9.     Plaintiff has fully complied with all the statutory and administrative prerequisites for the filing of this action.


THE PARTIES

10.     Plaintiff Deborah Suss Esposito is a female citizen who, at all times relevant herein, resided at 50 Emerson Court, Staten Island, NY.

11.     Defendants herein are, on information and belief, an interlocking group of entities and individuals who control such entities.  Throughout the course of Plaintiff's dealings with Defendants, she has received writings from Defendants, and been told conflicting information by Defendants and their agents, about where the assets of such entities reside, as well as who or what owns which entities.   However, as more fully stated *infra*, there are overlapping and common interests, management and ownership among all the Defendants, including without limitation that, on information and belief, defendants David Gentile, Bernard Pismeny and Robert Kessler, own controlling interests in, and have substantial management and Board roles in, all of the defendant entities.  Defendants also have a high degree of interrelationship among their operations and centralized control of

3

labor relations. As such, at all times relevant herein, Defendants were and/or are a single integrated enterprise/entity. The following allegations regarding Defendants are made on information and belief, and are subject to verification through discovery.

## EXENET LLC

12.     On information and belief, and at all times relevant herein, defendant EXENET LLC was and is a New York based limited liability company, having a business address, at the time of Esposito's termination, at 220 West 42nd Street, New York, NY 10036.

13.     On information and belief, and at all times relevant herein, the controlling members of defendant EXENET LLC were defendants BedRoc Partners, LLC, David Gentile, Bernard Pismeny and Robert Kessler.

14.     On information and belief, and at all times relevant herein, defendant EXENET LLC employed at least 15 employees in each of twenty or more calendar weeks in the current or preceding year.

## EXENET HOLDINGS LLC

15.     On information and belief, and at all times relevant herein, defendant EXENET Holdings LLC was and is a New York based limited liability company, having a business address, at the time of Esposito's termination, at 220 West 42nd Street, New York, NY 10036.

16.     On information and belief, and at various relevant times herein, defendant EXENET Holdings LLC was the parent company of EXENET LLC, according to the employment agreement given to Plaintiff.

4

17.     On information and belief, and at all times relevant herein, the controlling members of defendant EXENET Holdings LLC were and are defendants BedRoc Partners LLC, David Gentile, Bernard Pismeny and Robert Kessler.

18.     On information and belief, and at all times relevant herein, defendant EXENET Holdings LLC employed at least 15 employees in each of twenty or more calendar weeks in the current or preceding year.


EXENET Technologies, Inc.

19.     On information and belief, and at all times relevant herein, defendant EXENET Technologies, Inc. was and is a Delaware-based corporation, licensed to do business in New York, which at all times relevant during Esposito's employment, shared a business address with EXENET LLC and EXENET HOLDINGS LLC.

20.     On information and belief, and at all times relevant herein, defendant EXENET Technologies, Inc. employed at least 15 employees in each of twenty or more calendar weeks in the current or preceding year.

21.     On information and belief, and at all times relevant herein, defendant EXENET Technologies, Inc. was and is owned in whole or in part by defendants EXENET LLC and/or EXENET Holdings LLC and/or BedRoc Partners, LLC.

22.     On information and belief, and at all times relevant herein, defendants EXENET LLC, EXENET Holdings LLC and EXENET Technologies, Inc. held themselves out as a single entity and did business as a single entity.  They are hereafter collectively referred to as "EXENET."

23.     On information and belief, and at all times relevant herein, defendant EXENET was and is a premier provider of IT solutions to its clients, which include AmLaw 100 law firms, leading financial services firms, wealth management companies and Fortune 500 companies.  Such services include, without limitation, information technology consulting; setting up, monitoring and maintaining computer systems; and integrating electronic information systems – all on a national and international basis.

BedRoc Partners, LLC

24.     On information and belief, and at all times relevant herein, defendant BedRoc Partners, LLC was and is a New York-based limited liability company, having a business address at 159 Northern Boulevard, Great Neck, NY  11021.

25.     On information and belief, and at all times relevant herein, the controlling members of defendant BedRoc Partners, LLC were and are defendants David Gentile, Bernard Pismeny and Robert Kessler.

26.     On information and belief, at some time during the course of Plaintiff's employment with Defendants, defendant BedRoc Partners, LLC assumed full ownership of EXENET, according to Wael Sobhy (the Director of Finance at defendant EXENET LLC).

27.     On information and belief, according to Wael Sobhy, defendant Exenet Technologies Inc.'s debt was placed on defendant EXENET LLC's books, but defendant BedRoc Partners, LLC and its investors have a preference over that debt.

28.     On information and belief, and at all times relevant herein, defendant BedRoc Partners, LLC controlled the operations of EXENET.

29.    On information and belief, and at all times relevant herein, defendant BedRoc

Partners, LLC, together with EXENET, employed at least 15 employees in each of twen-

ty or more calendar weeks in the current or preceding year.

COMGroup Holding LLC d/b/a Alphaserve Technologies

30.    On information and belief, in or about March 2010, one or more Defendants here-

in formed defendant COMGroup Holding  LLC.

31.    On information and belief, defendant COMGroup Holding LLC is a New York

based limited liability company, having a business address at 104 West 27th Street, New

York, NY  10001.

32.    On information and belief, the registered agent for receipt of process from the

Secretary of State for COMGroup Holding LLC is James A Prestiano, the same attorney

who has represented Defendants throughout this matter, as more fully stated *infra*, and

who, on information and belief, has for many years represented defendants EXENET

LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC,

David Gentile, Bernard Pismeny and Robert Kessler on various matters related to the in-

terests of those entities and people.

33.    On information and belief, in or about July 15, 2010, defendant COMGroup

Holding LLC registered the assumed name "Alphaserve Technologies" with the New

York State Department of Corporations.

34.    On information and belief, thereafter Defendants began to do business as, and

presented themselves to the world as, Alphaserve Technologies, including but not limited

to:  advising all of EXENET's clients that the company would now be known as Al-

7

phaserve; taking over many, if not all, of EXENET's contracts with its clients without issuing new contracts; continuing to do business with clients formerly served by EX-ENET; and making use of the credit line that was set up by and for EXENET.

35.     On information and belief, COMGroup Holding LLC d/b/a Alphaserve is run by many of the same managers and equity holders who ran EXENET and held equity in EXENET, including, without limitation: Arup Das, who served as CEO of EXENET at the time of Plaintiff's termination and, according to press reports, became CEO of COMGroup Holding LLC d/b/a Alphaserve; Eric Guttridge, who, according to his Linked In page was a Managing Director of EXENET LLC from October 2006 through July 2010, but in March 2010 became the Chief Operating Officer of COMGroup Hold-ing LLC d/b/a Alphaserve Technologies – a three month overlap; and Vasu Rao, who performed a major finance role for EXENET and is now a member of COMGroup Hold-ing LLC.

36.     On information and belief, and according to the Linked In page of Eric Guttridge, prior to joining EXENET, and until September 2006, Guttridge was the President and Owner of EAG Consulting, Inc.  On information and belief, in or about September 2006, EXENET purchased all the assets of EAG Consulting, Inc.   On information and belief, and at all times relevant herein, EAG Consulting, Inc., used the registered d/b/a of Com-Group East.

37.     On information and belief, defendant COMGroup Holding LLC d/b/a Alphaserve Technologies uses the phone number that was previously assigned to EXENET.

38.     On information and belief, as of August 2010, at least 24 EXENET employees were working for defendant COMGroup Holding LLC d/b/a Alphaserve Technologies, with no break in service.

39.     On information and belief, and according to an employee who worked at EX-ENET on an H1 visa, she and other EXENET employees on H1 visas who went to work for defendant COMGroup Holding LLC d/b/a Alphaserve Technologies, did not require any adjustments to their visa statuses because they had not experienced a change in employer.

40.     On information and belief, defendant COMGroup Holding LLC d/b/a Alphaserve Technologies does business with Reality IT Services and Gregory Spagnuolo, who, on information and belief, used to service EXENET's Boston business and now has an extension on the Alphaserve phone system.

41.     On information and belief, defendant COMGroup Holding LLC d/b/a Alphaserve Technologies took over the website previously maintained by EXENET, replaced all references to EXENET with Alphaserve Technologies, and continued to use that website in substantially similar format for some period of time.

42.     On information and belief, defendant COMGroup Holding LLC d/b/a Alphaserve Technologies has access to and retrieves all the mail addressed to EXENET.

43.     On information and belief, and at all times relevant herein, defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC and COMGroup Holding LLC d/b/a Alphaserve Technologies had, and continue to have, an identity of interest with one another, operate as a single integrated entity/enterprise and hold themselves out as a single entity/enterprise.

44.     On information and belief, defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is a successor to defendants EXENET LLC, EXENET Holdings LLC, EX-ENET Technologies, Inc. and BedRoc Partners, LLC.


David Gentile

45.     On information and belief, and at all times relevant herein, defendant David Gentile was and is a citizen of the state of New York, residing in Nassau County, New York.

46.     On information and belief, and at all times relevant herein, defendant Gentile was and is a controlling owner of defendants EXENET LLC, EXENET Holdings LLC, EX-ENET Technologies, Inc., BedRoc Partners, LLC and COMGroup Holding LLC d/b/a Alphaserve Technologies.

47.     On information and belief, and at all times relevant herein, defendant Gentile was the Chair of the Board of EXENET LLC and Exenet Technologies, Inc.

48.     On information and belief, and at all times relevant herein, defendant Gentile was and is a partner in the accounting firm of Gentile Pismeny & Brengel LLP ("GPB"), which maintains its primary office at 159 Northern Boulevard, Great Neck, NY 11021.

49.     On information and belief, and at all times relevant herein, GPB has always performed the accounting services for defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC, and may also perform accounting services for defendant COMGroup Holding LLC d/b/a Alphaserve Technologies.

50.     On information and belief, and at all times relevant herein, GPB maintained an office at the same premises as EXENET and, later, COMGroup Holding LLC d/b/a Alphaserve Technologies.

10

Bernard Pismeny

51.     On information and belief, and at all times relevant herein, defendant Bernard Pismeny was and is a citizen of the State of New York, residing in Nassau County, New York.

52.     On information and belief, and at all times relevant herein, defendant Pismeny was and is a controlling owner of defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC and COMGroup Holding LLC d/b/a Alphaserve Technologies.

53.     On information and belief, and at all times relevant herein, defendant Pismeny was and is a partner in Gentile Pismeny.

54.     In addition to the allegations against Defendant Pismeny, *infra*, Defendant Pismeny is a necessary party to this action.


Robert Kessler

55.     On information and belief, and at all times relevant herein, defendant Robert Kessler was and is a citizen of the state of New York, residing in Nassau County, New York.

56.     On information and belief, and at all times relevant herein, defendant Kessler maintained an office at the same premises as EXENET and, later, defendant COMGroup Holding LLC d/b/a Alphaserve Technologies.

57.     On information and belief, and at all times relevant herein, defendant Kessler was and is a controlling owner of defendants EXENET LLC, EXENET Holdings LLC, EX-

ENET Technologies, Inc., BedRoc Partners, LLC and COMGroup Holding LLC d/b/a Alphaserve Technologies.

58.     In addition to the allegations against Defendant Kessler, *infra*, he is a necessary party to this action.


FACTS

Gender-based Discrimination

59.     Plaintiff Esposito was hired by EXENET on or about September 17, 2004 in connection with its purchase of her former employer, CNT Legal Division.

60.     Prior to her employment at EXENET, Plaintiff had worked for some ten years (the last three of which were at CNT Legal Division), developing extremely valuable ongoing business relationships with some 23 law firms plus many additional commercial clients.

61.     On information and belief, prior to EXENET's purchase of the CNT Legal Division, EXENET was in grave financial condition and lacked the necessary systems and personnel to expand its market.

62.     On information and belief, by purchasing the CNT Legal Division, EXENET immediately more than doubled its client base and revenues, as well as obtaining a document management system, legal intellectual property, scopes, audits, client environment information and more.

63.     Among the conditions of the sale of CNT Legal Division to EXENET were that Plaintiff would agree to the move and would receive an employment contract that would

include a right to specified equity in EXENET and a signing bonus of approximately $35,000.00.

64.     On or about September 17, 2004, Esposito and EXENET LLC entered into an employment agreement, dated and signed on the same date ("The Employment Agreement"). The Employment Agreement, which is attached hereto as Exhibit 1, provided, *inter alia*, the terms of Esposito's employment with EXENET, including without limitation, the job title Director of Sales, a salary, a commission formula and entitlement to equity in Exenet Holdings LLC as follows:  2% equity vesting ratably over three years, plus an additional up to 2.5% equity tied to achievement of certain milestones in Net Services Revenues.

65.     Upon her hire, Esposito reported directly to the CEO, who, at that time, was Umit Cinali.

66.     Plaintiff's responsibilities were to sell EXENET's services to commercial and legal clients and to develop new clients for EXENET.

67.     EXENET provided and, together with defendant COMGroup Holding LLC d/b/a Alphaserve Technologies continues to provide, service to clients in various ways, including setting up information technology systems, monitoring such systems and consulting.

68.     As more fully described in The Employment Agreement, Plaintiff was entitled to receive commissions on all sums collected by Defendants for the performance of such work.  Hence, Plaintiff received one-time commissions for individual deals and continuing commissions for ongoing monitoring work.

69.     Esposito was highly successful in her work for Defendants. From 2004 through 2008, Esposito was, on information and belief, one of the top - if not the top - business deal closer at EXENET.

70.     Throughout her entire employment by Defendants, Esposito was, on information and belief, the highest ranked female and the only female manager.

71.     Defendants repeatedly favored similarly situated male employees over Plaintiff. For example, in or about 2006, Defendants removed Plaintiff's commercial clients from her and assigned them to male managers and salespeople. As a result of the client reassignment, Esposito was deprived of any resulting income (both for new sales and recurring business) on the commercial clients she had developed, including many she had brought with her from CNT Legal Division.

72.     Throughout her entire employment by Defendants, Esposito was repeatedly subjected to sexually discriminatory and offensive comments, which conduct and comments demonstrated Defendants' sexually discriminatory animus. For example, Wael Sobhy, the Director of Finance, once became abusively loud toward Esposito and physically restrained her. The then CEO of EXENET, Umit Cinali, who was present, had to intervene to force Sobhy to cease.  On information and belief, Sobhy never treated males in this abusive manner.

73.     Esposito complained to Cinali that such behavior was intolerable and Cinali later advised Esposito that he reprimanded Sobhy for his behavior.

74.     Nonetheless, Sobhy's overtly sexually discriminatory behavior continued. Esposito overheard Sobhy state to another peer, Eric Guttridge (the Managing Director of Support), that Esposito had slept with a client to close the deal and should sleep with him

to collect the unpaid bill.  This statement was both false and deeply offensive.  Esposito complained to Cinali about this, as well.

75.     On information and belief, and according to Cinali, Sobhy made similar gender-based derogatory comments about Esposito on numerous occasions.

76.     At all times relevant herein, Sobhy served as EXENET's Director of Human Resources.

77.     Throughout Esposito's employment by Defendants, defendant Kessler repeatedly demeaned Plaintiff by addressing her as "Blondie" in front of her colleagues and clients, instead of using her name.   This conduct was both offensive and unwelcome.

78.     Plaintiff repeatedly complained to Cinali about Kessler's conduct, but it continued.

79.     Defendants' gender-based discriminatory animus toward Esposito was carried out in multiple additional ways, including without limitation, through denying her the equity and attendant benefits to which she was entitled.

80.     On September 18, 2005, Esposito became vested in .67% equity in EXENET Holdings LLC, in accordance with The Employment Agreement.

81.     On September 18, 2006 Esposito became vested in a total of 1.34% equity in EX-ENET Holdings LLC, in accordance with The Employment Agreement.

82.     On September 18, 2007, Esposito became vested in a total of 2% equity in EX-ENET Holdings LLC, in accordance with The Employment Agreement.

83.     Before the end of 2006, in accordance with the Employment Agreement, Esposito became entitled to an additional 1.5% vested equity, due to having achieved the goal of the legal services division reaching $2,200,000 in Net Services Revenues within 2006.

84.     Once Esposito had earned her full 3.5% equity, she repeatedly attempted to con-firm with defendant David Gentile and other representatives of Defendants that they would honor The Employment Agreement, record her equity entitlements appropriately and afford her all the indicia and privileges of equity ownership.

85.     Despite the clear wording of The Employment Agreement entitling Esposito to such equity, Defendants repeatedly denied her access to membership agreements, operat-ing agreements, and other applicable documents and, on information and belief, her eq-uity shares were never formally recorded in any applicable agreements or other docu-ments.

86.     In or about September 2009, during Esposito's seventh month of a pregnancy with twins, she endured several multiple hour meetings at which she argued for the 1.5% equity share tied to Net Services Revenues.   Defendants were represented at this meeting by Wael Sobhy, the Director of Finance and aforementioned manager who had publicly referred to Esposito sleeping with clients and behaved abusively toward her, as more ful-ly described *supra*.   Sobhy steadfastly attempted to disprove Esposito's entitlement, challenging whether she had reached the required goal.   For example, Sobhy falsely claimed that Esposito was not entitled to credit for the sales of her subordinate, because that salesperson did not work under her and was hired by a different manager.   When Es-posito insisted that Sobhy, Head of HR at the time, check the Human Resources records and hiring manager paperwork, Sobhy had to concede that Esposito qualified for the ad-ditional 1.5% equity.   Sobhy was visibly and audibly unhappy with this outcome.   Es-posito later heard Sobhy on the phone saying that there was nothing he could do because the documents did not support him.

87.     On information and belief, men who were promised equity, including without limitation, Umit Cinali, Arup Das and Eric Guttridge, did not have to fight to have their shares recognized by the all-male dominated management and LLC Board members.

88.     On information and belief, once the men's equity had vested, they were permitted to attend meetings of the LLC members and LLC Board meetings, while Esposito was excluded from such meetings after her equity vested.

89.     On information and belief, the men with vested equity interests were afforded access to all the membership agreements, operating agreements, and other applicable documents in relation to their equity ownership.

90.     On information and belief, Defendants have manipulated the debts and ownership interests of EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., Bed-Roc Partners, LLC and COMGroup Holding LLC d/b/a Alphaserve Technologies, with the purpose and/or effect of depriving Esposito of equity in an entity with any value.


Pregnancy Discrimination

91.     The sexually discriminatory behavior directed toward Esposito escalated upon the announcement of her pregnancy with twins in or around the middle of April 2009.

92.     For example, defendants David Gentile and Robert Kessler, who were frequently at the EXENET offices, began to ignore Plaintiff, walking right past her without acknowledging her presence.  Before she became pregnant, they would greet her upon seeing her.

93.     In or about May 2009, EXENET announced that Umit Cinali was replaced by Gil Shaked as CEO.  Upon meeting Shaked, Esposito told him of her pregnancy.

94.     Thereafter, Defendants' management began to frequently ignore Esposito's requests and deprive her of support services for her sales, such as staff to develop the "white boards" that are the technical drawings she used in her sales presentations.

95.     As the time to prepare for Esposito's maternity leave approached, Defendants announced their discriminatory intent.  In or about September 2009, in a meeting with then CEO Gil Shaked, during which Esposito attempted to describe for him the coverage arrangements for her business, Shaked emphatically stated that Esposito's priorities would change once she had given birth.  Esposito assured Shaked that her priorities would remain as they always had been - to earn money for the firm - and explained that she is the primary earner in her family, since her husband was disabled in the line of duty as a police officer.   Shaked replied that he was sure he was right about Esposito's priorities and that Esposito would see.

96.     At the same meeting, Shaked warned Plaintiff that she needed to close two more deals before the end of the year, even though he knew that her maternity leave was scheduled to start within approximately one week and would last through approximately the end of December.

97.     Around the same time, CEO Shaked permanently removed approximately five accounts from Esposito and, on information and belief, assigned them to males:  Danny Cevallos (Esposito's subordinate) and Arup Das (Esposito's peer).  On information and belief,  Shaked did not remove accounts from any of the men, including Sylvain Ardient, who had over 35 accounts and, on information and belief, had, over the previous year, been so unsuccessful at sales that management had discussed demoting him to a support position.

98.     On information and belief, Shaked subsequently assigned one of Esposito's law firm accounts to Ardient.   Esposito had already made a proposal to that firm for a desktop project.   On information and belief, Das accompanied Ardient to one meeting with the client, but after that, there was no followup and the business was lost.

99.     Esposito expressed concern to Shaked that the permanent re-assignment of her accounts just before she left on maternity leave would erroneously signal to her clients that she was not returning, which might shake their confidence in the service they could expect from EXENET, as well as reflecting poorly on her.   Shaked proceeded over Esposito's objections.

100.    Prior to commencing her maternity leave, Plaintiff attempted to arrange for coverage of all her ongoing business by composing a comprehensive list (which Shaked approved) and speaking with her colleagues and management about open items that required followup during her absence.

101.    Plaintiff began her maternity leave on October 6, 2009 and gave birth the next day.

102.    Despite all Plaintiff's efforts, on information and belief, while Plaintiff was on maternity leave, Defendants failed to follow up on her outstanding business items as set forth in the comprehensive list, ignored requests for information and followup from Plaintiff's clients, and took cancellation on at least one of Plaintiff's client contracts in violation of the cancellation protections contained within such contract.   Huge business was lost, the value of which Plaintiff estimates to be approximately $3 million.   On information and belief, Plaintiff would have earned approximately $162,000 in commissions on such business.

103.    On information and belief, had Plaintiff been a male going out on medical leave, Defendants would have followed Plaintiff's comprehensive leave memo and covered the open business in order to preserve it for Plaintiff to return to.

104.    On information and belief, Defendants have a history of treating men's and women's leaves discriminatorily.  On information and belief, the only other woman to take a maternity leave was a female engineer, who was terminated within a short time after her return.  By contrast, a male Strategic Manager for the Network Operating Center named Tom, took a leave due to a medical condition and was welcomed back.

105.    Due to the demonstrated lack of respect for, and discriminatory attitude toward, Esposito as a female salesperson, and in reliance on their unlawful prejudice that Plaintiff would not be a valuable employee once she gave birth, Defendants ignored Plaintiff's clients and requests for coverage and allowed her business to founder while Esposito was on maternity leave, in the apparent hope that if she had little to no business to return to, she would not return to EXENET at the end of her maternity leave.

106.    During her maternity leave, Plaintiff valiantly attempted to cover business, including without limitation, closing a deal for approximately $80,000.00.

107.    Throughout her maternity leave, Defendants behaved rudely and disrespectfully toward Esposito.  Such behavior included, without limitation:  Sam Naftalovich (the Director of Professional Services) screamed at Plaintiff over the phone while she nursed her twins, allegedly because she had phoned him and another member of EXENET management several times asking them to address a client concern for which the client had set a noon deadline; on information and belief, Naftalovich badmouthed Plaintiff to her colleagues for persisting in contacting EXENET management regarding her clients' con-

cerns; and CEO Shaked demeaned Esposito at a November 2009 meeting (that she attended while she was still on leave) by telling her that she could not speak unless he handed her a pen. While she was obliged to remain silent, Shaked defended Naftalovich for yelling at Esposito.

108.    Also during her maternity leave, Defendants attempted to withdraw from a $5,000 commitment they had made to sponsor a Law Firm event, which sponsorship provided free admission for several of Esposito's clients. Shaked told Plaintiff that Defendants could not afford the sponsorship. At the same time, on information and belief, male employees continued to receive full entertainment budgets. According to Das and other of Defendants' employees and agents, Shaked continued receiving reimbursements for monthly entertainment ranging between $4000 and $5000 and male salespeople were permitted to continue attending outings, luncheons, seminars and other events where they could attempt to develop connections. While out on her leave, Esposito was obliged to urge Shaked to honor the commitment so as to avoid the embarrassment of uninviting four of Esposito's premiere clients.

109.    During Esposito's maternity leave, she retained an attorney, who, according to Defendants' submission to the EEOC, contacted Defendants on or about December 18, 2009, and advised their counsel, James A. Prestiano, among other things, that Defendants were engaging in unlawful sex discrimination, including, without limitation, Shaked telling Esposito that her priorities would change after she gave birth, Shaked yelling at Esposito and demeaning her in front of other employees, and a co-employee yelling at Esposito.

Ongoing Discrimination and Retaliation

110.   Esposito returned to work at EXENET on or about January 4, 2010.

111.   Immediately upon returning, Esposito learned that Shaked had hired Steven Bussey and given him the job title Director of Sales – the title given to Esposito in The Employment Agreement.  Shaked declared that Esposito would now report to Bussey instead of the CEO.

112.   On information and belief, Esposito was the only person who was so demoted. All other employees who had reported to the CEO (all of whom were male), continued to report to the CEO.

113.   On information and belief, Bussey, who had been brought into EXENET as a consultant in or about October 2009, had far less relevant experience than Esposito, who was more qualified for the new position.  More specifically, on information and belief, Bussey had no significant experience with the IT needs of law firms, and his experience in financial institutions did not involve running or overseeing their technology, much less selling those services.  By contrast, Esposito had been selling technology services at a very high level for over thirteen years, had an extensive network of client relationships, and had serviced both commercial and financial firms, in addition to law firms, at Exenet and earlier in her career.

114.   On information and belief, word of Esposito's demotion quickly spread among her peers and her clients, causing her embarrassment and damage to reputation.

115.   Bussey immediately began to engage in offensive, sexist behavior, including without limitation, referring to a person as "a dick" during a meeting that Plaintiff attended.

22

116.    Plaintiff objected to Bussey's offensive use of language, but he did not apologize and, to Plaintiff's knowledge, no one directed Bussey to cease the use of such foul language.

117.    Shortly after her demotion, Esposito was given the opportunity to bid for a contract worth in excess of $1 million.  On information and belief, Esposito was a "shoe-in," because she had been recommended by the COO of one law firm to the law firm seeking the bid.

118.    In accordance with the new management structure, Esposito gave the Request for Information ("RFI") to Bussey.  Bussey showed the completed RFI to Esposito.  When Esposito reviewed it, she found it deficient in numerous ways, including without limitation, that it omitted relevant experience that would support EXENET's bid for the contract.  Esposito advised Bussey of the RFI's shortcomings, but Bussey replied that he had reviewed it with the team and he approved it over Esposito's objections.   Bussey directed Esposito to submit the RFI as executed and she complied.

119.    Prior to Bussey's promotion, Esposito would have completed the RFI (with some technical input from her colleagues) and submitted the RFI.

120.    On information and belief, Defendants were never called back for round two of the bidding process and lost the business that was worth approximately $1.2 million.

121.    On information and belief, Bussey's deficient RFI caused Defendants to lose the work and Plaintiff to lose substantial commissions.

122.    On information and belief, shortly after Esposito's demotion, her then attorney contacted Defendants' attorney James A. Prestiano again and, according to Defendants'

submission to the EEOC, informed Prestiano that Esposito was expanding her claims to include demotion based on her gender.

123.    On or about January 12, 2010, defendant David Gentile announced that he had terminated Gil Shaked as CEO and replaced him with Arup Das, who had previously served as EXENET's Head of Financial and Commercial Sales and Chief Technical Officer.

124.    That same day, Esposito met with Das, followed by a joint meeting among herself, Das and defendant Gentile, followed by a meeting alone with defendant Gentile. During each meeting, Esposito explicitly recounted the instances of discrimination she had suffered, as more fully described *supra*.

125.    The following night, January 13, 2010, Esposito received a voicemail from Das's cell phone that appeared to be a conversation between Das and defendant Gentile. Esposito could hear defendant Gentile on the cell phone message telling Das to fire Esposito.

126.    At the instructions of Defendants, Esposito subsequently returned the cell phone to Defendants, but placed Defendants on notice to preserve the cell phone and its voicemail messages.

127.    Less than one week later, on or about January 18, 2010, Esposito's then attorney received an email from Defendants' attorney, James A. Prestiano, firing Esposito. On information and belief, Esposito's termination was in retaliation for having complained to both Das and defendant Gentile of the ongoing discrimination she had suffered, her having asserted her rights through her then attorney, and the ultimate expression of the ongoing discriminatory practices against Esposito based on her gender and pregnancy.

128.    Esposito received no severance pay and was never paid her outstanding commissions or reimbursed for her outstanding business expenses.  On information and belief, such commissions total at least $20,000.00, but discovery is required to determine the actual amount.   Esposito is also owed two weeks' salary that was unlawfully withheld from her in or about February 2009.

129.    Plaintiff suffered extreme distress and humiliation as a result of all the foregoing conduct.  Plaintiff's pain and suffering was both physical and emotional, and included, without limitation, hives, panic attacks and blurred vision.  Plaintiff has been obliged to seek medical treatment and psychological therapy as a result of the treatment afforded her by Defendants.

130.    Plaintiff suffered enormous loss of commissions and other income due to Defendants' aforesaid unlawful behavior.

131.    The conduct of Defendants, as pleaded above, was and is wanton and reckless and done in such a manner and under such circumstances as to show heedlessness and an utter disregard of the results upon the rights of Esposito that may flow from the aforesaid acts or the manner in which they were done.

132.    The conduct of Defendants, as pleaded above, was malicious and done deliberately with knowledge of Esposito's rights and with intent to interfere with those rights.


### FIRST CAUSE OF ACTION

133.    Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

134.    At all times relevant herein, Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC were an integrated entity/enterprise and Plaintiff's employer under Title VII.

135.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC engaged in unlawful sex discrimination and pregnancy discrimination against Esposito in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.*, as amended by, among others, the Civil Rights Act of 1991.

136.    Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid unlawful behavior as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC and/or as a successor entity.


## SECOND CAUSE OF ACTION

137.    Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

138.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC engaged in unlawful retaliation against Esposito in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.*, as amended by, among others, the Civil Rights Act of 1991.

139.    Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid unlawful behavior as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC and/or as a successor entity.

26

## THIRD CAUSE OF ACTION

140. Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

141. At all times relevant herein, Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler were an integrated entity/enterprise and employers of Esposito under the NYC HRL, NYC Admin. Code §§ 8-101 *et seq.*

142. Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler engaged in unlawful sex discrimination and pregnancy discrimination against Esposito in violation of the NYC HRL, NYC Admin. Code §§8-101 *et seq.*, and more particularly NYC Admin. Code §8-107(1).

143. Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid unlawful behavior as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler, and/or as a successor entity.

## FOURTH CAUSE OF ACTION

144. Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

145. Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, and David Gentile engaged in unlawful retaliation against

Esposito in violation of the NYC HRL, NYC Admin. Code § 8-101 *et seq.*, and more particularly NYC Admin. Code §8-107(7).

146.    Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid unlawful behavior as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC and David Gentile, and/or as a successor entity.

## FIFTH CAUSE OF ACTION

147.    Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

148.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler aided, abetted, incited, compelled and/or coerced the doing of one or more acts forbidden by the NYC HRL, in violation of NYC Admin Code §8-107(6).

149.    Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid unlawful behavior as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler, and/or as a successor entity.

## SIXTH CAUSE OF ACTION

150.    Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

151.    On information and belief, and at all times relevant herein, Wael Sobhy, Gil Shaked, David Gentile and Robert Kessler exercised managerial or supervisory responsibility granted to them by Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler.

152.    On information and belief, and at all times relevant herein, Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler knew, or should have known, of their employees' and agents' discriminatory conduct and acquiesced in such conduct or failed to take immediate and appropriate corrective action.

153.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC,  David Gentile and Robert Kessler are liable for the discriminatory, retaliatory and otherwise unlawful actions and inactions of each and every one of their agents and employees, including, without limitation, Wael Sobhy, Gil Shaked, David Gentile and Robert Kessler, pursuant to the NYC Admin. Code §8-107(13).

154.    Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid unlawful behavior as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler, and/or as a successor entity.

155.    A copy of the original complaint with jury demand was served on the New York City Commission on Human Rights and the Corporation Counsel.

## SEVENTH CAUSE OF ACTION

156.    Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

157.    At all times relevant herein, Plaintiff was a Commission salesman, as that term is defined in NY Labor Law §190(6), in that she was an employee whose principal activity was the selling of goods and services, and her earnings were based in whole or in part on commissions. At the time Defendants withheld Plaintiff's wages and failed to pay her commissions, Plaintiff's principal activities were not of a supervisory, managerial, executive or administrative nature.

158.    At all times relevant herein, Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler were Employers, as that term is defined in NY Labor Law §190(3).

159.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler engaged in multiple violations of the NY Labor Law by withholding two weeks of Plaintiff's salary in February 2009 and by failing to pay her owed commissions, in violation of NY Labor Law §191(c).

160.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler engaged in additional violations of NY Labor Law §191(c) by repeatedly failing to provide Plaintiff with a statement of earnings paid or due and unpaid, as requested by Plaintiff's counsel to Defendant's counsel James A. Prestiano via letter on February 16, 2010 and again on March 12, 2010.

161.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler made unlawful deductions against Plaintiff's income by withholding two weeks of Plaintiff's salary in February 2009 and by failing to pay her owed commissions, in violation of NY Labor Law §193.

162.    The compensation owed to Plaintiff by defendants was non-discretionary and was guaranteed to Plaintiff as a term of her employment.

163.    Defendants were placed on notice of all the foregoing violations by letters from Plaintiff's counsel to Defendants' counsel James A. Prestiano on February 16, 2010 and again on March 12, 2010.

164.    Defendants' conduct as described above was and is in willful, knowing, deliberate and voluntary violation of Plaintiff's rights under the New York Labor Law.

165.    Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid unlawful behavior as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and Robert Kessler, and/or as a successor entity.


## EIGHTH CAUSE OF ACTION

166.    Plaintiff repeats and re-alleges each and every allegation contained in this complaint with the same force and effect as if set forth herein.

167.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC,  David Gentile, Bernard Pismeny and Robert Kessler breached the Employment Agreement by failing and refusing to formally grant  Plaintiff

the equity promised therein, and, on information and belief, failing and refusing to record her entitlement to such equity on the applicable membership agreements, operating agreements and other relevant documents.

168.    Defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile, Bernard Pismeny and Robert Kessler breached the Employment Agreement by failing to provide Plaintiff with all privileges and benefits attendant to her equity ownership entitlement.

169.    Defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is liable for the aforesaid conduct as an integrated entity/enterprise with defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile, Bernard Pismeny and Robert Kessler, and/or as a successor entity.

<u>RELIEF</u>

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment:

A.    On the First Cause of Action, declaring that defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC engaged in unlawful sex discrimination and pregnancy discrimination against Esposito in violation of Title VII, for which defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is also liable.

B.    On the Second Cause of Action, declaring that defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc. and BedRoc Partners, LLC engaged in unlawful retaliation against Esposito in violation of Title VII, for which defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is also liable.

C.      On the Third Cause of Action, declaring that defendants EXENET LLC, EX-
ENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gen-
tile and Robert Kessler engaged in unlawful sex discrimination and pregnancy discrimi-
nation against Esposito in violation of the NYC HRL, for which defendant COMGroup
Holding LLC d/b/a Alphaserve Technologies is also liable.

D.      On the Fourth Cause of Action, declaring that defendants EXENET LLC, EX-
ENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC and David
Gentile engaged in unlawful retaliation against Esposito in violation of the NYC HRL,
for which defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is also
liable.

E.      On the Fifth Cause of Action, declaring that defendants EXENET LLC, EXENET
Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gentile and
Robert Kessler aided, abetted, incited, compelled and/or coerced the doing of one or more
acts forbidden by the NYC HRL, for which defendant COMGroup Holding LLC d/b/a
Alphaserve Technologies is also liable.

F.      On the Sixth Cause of Action, declaring that Defendants EXENET LLC, EX-
ENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, COMGroup
Holding LLC d/b/a COMGroup East, David Gentile and Robert Kessler are liable for the
discriminatory, retaliatory and otherwise unlawful actions and inactions of each and
every one of their agents and employees, pursuant to the NYC HRL.

G.      On the Seventh Cause of Action, declaring that defendants EXENET LLC, EX-
ENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, David Gen-
tile and Robert Kessler engaged in multiple, willful violations of the NY Labor Law by

33

withholding two weeks of Plaintiff's salary in February 2009, by failing to provide Plaintiff with the legally mandated statements of earnings, and by failing to pay her owed commissions and business expenses, in violation of NY Labor Law §§191(c) and 193, for which defendant COMGroup Holding LLC d/b/a Alphaserve Technologies is also liable.

H.      On the Eighth Cause of Action, declaring that defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, COMGroup Holding LLC d/b/a Alphaserve Technologies, David Gentile, Bernard Pismeny and Robert Kessler breached and continue to breach The Employment Agreement and that Plaintiff is entitled to 3.5% equity ownership in whichever Defendant entity has assets of the highest value.

I.      On the First through Sixth Causes of Action, reinstating Plaintiff into the same or an equivalent position at EXENET and COMGroup Holding LLC d/b/a Alphaserve Technologies.

J.      On the First through Sixth and Eighth Causes of Action, directing all Defendants (i) to grant Plaintiff 3.5% equity in whichever Defendant entity has assets of the highest value; (ii) record such equity in all applicable documents; and (ii) to henceforth accord Plaintiff full rights attendant to such equity ownership interest, including without limitation: distributions; access to all membership agreements, operating agreements, minutes, documents previously distributed to members, and all other documents reflecting the formation and operation of such entity; access to inspect the books and records of such entity; and informing Plaintiff of and permitting her to attend all future membership meetings and activities.

K.      On the First and Second Causes of Action, awarding damages against defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC and COMGroup Holding LLC d/b/a Alphaserve Technologies in full compensation for all past and future lost wages, benefits, salary, commissions and bonuses.

L.      On the Third through Sixth Causes of Action, awarding damages against defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, COMGroup Holding LLC d/b/a Alphaserve Technologies, David Gentile and Robert Kessler in full compensation for all past and future lost wages, benefits, salary, commissions and bonuses.

M.      On the First and Second Causes of Action, awarding damages against defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC and COMGroup Holding LLC d/b/a Alphaserve Technologies in full compensation for all past, present and future pain and suffering and personal physical injury, in an amount to be determined by a jury.

N.      On the Third through Sixth Causes of Action, awarding damages against defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, COMGroup Holding LLC d/b/a Alphaserve Technologies, David Gentile and Robert Kessler in full compensation for all past, present and future pain and suffering and personal physical injury, in an amount to be determined by a jury.

O.      On the Seventh Cause of Action, awarding damages against defendants EXENET LLC, EXENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, COMGroup Holding LLC d/b/a Alphaserve Technologies,  David Gentile and Robert Kessler for all unpaid wages, commissions and unreimbursed expenses.

P.      On the Eighth Cause of Action, awarding damages against EXENET LLC, EX-ENET Holdings LLC, EXENET Technologies, Inc., BedRoc Partners, LLC, COMGroup Holding LLC d/b/a Alphaserve Technologies, David Gentile, Bernard Pismeny and Robert Kessler for all sums of money which Plaintiff should have received as an equity owner of EXENET Holdings LLC, EXENET LLC, EXENET Technologies, Inc., Bed-Roc Partners, LLC and/or COMGroup Holding LLC, including without limitation, her rightful share of all distributions, in accordance with distributions made to any other equity owners, and compensation to make her whole for all other benefits of equity ownership of which she was deprived.

Q.      On the First through Sixth Causes of Action, punitive damages in an amount to be determined by a jury.

R.      On the Seventh Cause of Action, liquidated damages in the amount of twenty-five percent of any unpaid commissions and wages found to be due plus all additional sums authorized by Labor Law §198.

S.      For pre-judgment interest on all the foregoing damages, where applicable.

T.      For reasonable attorneys fees, as authorized by Title VII, the NYC HRL and the New York Labor Law.

U.      For all the costs and disbursements of this action; and

V.      For such other and further relief as this Court deems necessary and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff hereby demands a trial by jury in this action.

Dated: New York, NY
      May 17, 2011

                                 Yours, etc.

                                 Ritz Clark & Ben-Asher LLP
                                 Attorneys for Plaintiff
                                 40 Exchange Place, Suite 2010
                                 New York, NY  10005
                                 212-321-7075

                                 By:_____
                                     SUSAN RITZ (1076)

**EXHIBIT 1**



September 17, 2004

Deborah Suss
50 Emerson Court
Staten Island, NY 10304

Dear Deborah:

In connection with EXENET LLC's acquisition of the CNT Legal Division, EXENET is pleased to extend an offer of employment to you for the position of Director of Sales. Should you accept our offer, your employment will commence on September 20, 2004 and your annual base salary will be $120,000 paid bi-monthly. You will also be entitled to earn commissions based on your sales of EXENET products and services in accordance with EXENET's sales commission plan.

EXENET will recognize your seniority with CNT with respect to your vacation days and vesting schedules. Until the annual renewal of EXENET's medical benefit plans, you will receive the identical medical benefits you had at CNT pursuant to COBRA. The COBRA benefits shall be paid by EXENET and your contribution to the medical benefits shall be identical to the medical benefit contributions you paid at CNT. You are eligible to join the EXENET 401(K) and rollover your CNT 401(K) plan.

Our offer is contingent upon a start date of no later than September 20, 2004 and successful completion of our pre-employment screening process that includes:

1. Completion of the attached employment application (if not previously completed) and returned to me by September 20, 2004.
2. Execution by you of our attached standard Proprietary Information and Assignments Agreement.

I would like you to know that we are excited about the possibilities created by this highly complimentary acquisition and feel you can make an immediate and significant contribution to our efforts. If you agree to the above terms, please sign and return this letter to me as well as the information requested above. By signing this offer letter, you represent that you have no restrictions from a previous employer that would prohibit you from accepting a position with our company. If you have any questions about this offer or the company, please feel free to contact me at your earliest convenience.

Sincerely,

Umit Cinali
CEO and President

Accepted by                                9-17-04
                                            Date

EXENET LLC
387 PARK AVENUE SOUTH • NEW YORK, NY 10016
TEL: 212.684.7300 • FAX: 212.685.7636
www.exenet.com

# APPENDIX A

# EXENET LLC

## 2004-05 Sales Compensation Plan

EXENET LLC, hereinafter referred to as "EXENET", compensates its market facing staff, whose members are referred to as IT Sales Consultant ("Consultant"), through a combination of base salary, and commissions tied to sales of EXENET's products and services.   This Sales Compensation Plan (the "Plan") details the specifics of EXENET's direct sales compensation program.

### Plan Period

The Plan covers the period from Sep 18, 2004 through December 31, 2005 ("the Plan Period"). The Plan is designed to support the revenue and profitability goals of EXENET, and EXENET reserves the right to change the Plan as required.

### Territory

Each Consultant is assigned a set of accounts within a specific market segment and/or geography, referred to as Territory.  The Consultant is accountable for all activities within the Territory, with the exception of specific activities as addressed in the "House Accounts" section of this Plan, and driving the Territory's revenue growth.

### Total Compensation

The Consultant compensation includes two components:  base salary and sales commissions.

#### Base Salary

Base salary is payable semi-monthly.

#### Sales Commissions

Commissions are paid for revenues generated from Monthly Recurring Revenues ("MRR") for Managed Services ("MSP"), and net contributions achieved from System/Network Integration (SNI) projects, including the sale or resale of professional services, hardware, and software products.  MRR-based product/service sales may include set-up charges, referred to as Non-Recurring Charges ("NRC").  Contributions from NRC shall be credited towards SNI contributions:

## SNI

(1) Net Contribution for labor services is based on an estimate of 45% of net professional services revenues or actual gross margin on a jobs performed, whichever is lower. Net revenue is the invoiced amount minus taxes, freight, and any fees, charges or commissions paid to third parties.

(2) Net Contribution for hardware and software sales is based on gross profit, which is the difference between the invoiced amount minus the cost of hardware and software, minus any taxes, freight and third party fees, charges and commissions.

(3) The commissions for SNI are determined per the following schedule, provided Net Contributions for the month exceed $10K or $30K per quarter:

| Type of Sale | Commission Rate (Percent of Net Contribution) |
|---|---|
| Labor Services | 12% |
| Product -- HW and SW | 8% |

## Managed Services

(1) Commission for managed services will be based on 125% of the contracted MRR amount, for a contract of 12-months or greater, minus any taxes and third party fees or commissions. For contracts in excess of 12-months, 25% additional commissions shall be paid every six months after the first year anniversary. Commissions will be paid per the following schedule:

| Time of Payment | Commission |
|---|---|
| Upon receipt of first full month's payment | 75% of MRR |
| Upon receipt of 6th month's payment | 50% of MRR |
| Every 6 months after first 12 months | 25% of MRR |

(2) Promotional free service month(s), which can only be offered with approval of EXENET's President, shall not be included in the contract term.

(3) If client elects to pre-pay for the year, then full commission shall be due upon receipt of annual payment.

(4) For renewal of managed services contracts with an existing client with at least 12 months of prior service, the commissions will be 50% of first full month's MRR paid upon receipt of first payment in the extended contractual period.

(5) If client is not on a contract, i.e. month-to-month, commissions shall be paid as follows:
    a.   75% of MRR upon receipt of 6th month's payment
    b.   50% of MRR upon receipt of 12th month's payment

(6) If the amount of MRR changes during the contract term:
   a. Any upward adjustment will be treated as a new MRR and be subject to the corresponding commission rates stated in (1)
   b. If the MRR is adjusted downward, the commissions shall be prorated for the term of the contract.

(7) If a managed services contract is terminated and/or cancelled during the initial agreement term, the commission shall be adjusted on a prorated basis provided the Client pays for the services for a minimum of three (3) months.  For example, if a Client were to terminate after 6 months into a one-year contract, the Representative would qualify for 50% of the annual commissions recurring revenue, i.e. .625% of the first month's recurring revenue.  If a Client terminates and/or cancels services within the first three (3) months of services, no commissions shall be paid, and any commission payments made shall be charged back.  In case of cancellation by a Client that had pre-paid for the services, the commissions paid on rebated sums to Client shall be recovered from Consultant.

(8) For commissions beyond the initial year, the Plan assumes the IT Consultant is actively involved in maintenance the client relationship to qualify for MRR based commissions.

**Consultant Responsibilities**

This Plan assumes the Consultant is actively supports his/her accounts.  The following are of some of the main activities of the IT Consultant:

- Nurture Client relationship at the decision maker level
- Maintain relationship with key client staff
- Compile sales proposals and quotations
- Orchestrate EXENET resources for ongoing support and issue resolution
- Follow up on accounts receivable and assist with collections

**Account Discovery**

An Consultant may uncover *qualified opportunities* outside his/her Territory.   Such discovery should be communicated to EXENET's Vice Presidents in charge of sales as soon as possible along with contact information and a description of the sales opportunity.

EXENET encourages Consultants to uncover as many opportunities as possible within and outside of their Territory.  The Consultant transferring the account shall receive 20% of the Net Contribution from the first sale, that may take place within the first six months after date of transfer, with the Consultant assigned to the account receiving the remaining 80%.

**Commission Payments**

Commission payments are calculated within 10 days after the close of each month.  Commissions are paid on receipt of client payments.  Commission payments are made with the end of month payroll.   Payments shall be accompanied by a statement, which shall include the list of client payments, and the corresponding net contributions.

During calendar year 2005, Consultant shall receive commissions upon invoicing of labor services to clients, provided the commissions associated with outstanding receivables shall not exceed $15,000. For invoices that are due in excess of 90 days, the commissions shall be reversed, and re-paid upon receipt of payment from client.

If EXENET were to issue a credit to a client, any commission(s) that has already been paid shall be charged back to the IT Consultant. Commission charge backs shall be applied on the month the payment is made to the client, and will be reflected on the following month's commission statement.

### Issue Resolution and Escalation

Any questions on commission payments shall be directed to the Vice President in charge of sales for resolution. The Vice President will follow standard escalation processes to attain final issue resolution.

### Payments in Case of Separation

In the case Consultant is terminated "without cause", the Consultant shall receive payment for booked business within the assigned territory per the following schedule:

- For managed services, commission accrual will cease at time of termination. All commissions due are paid as payments are received from clients.
- Full commission on SNI contributions within 3 months following termination.

Consultant will forfeit all commission payment(s) if he/she is terminated "for cause" as defined in EXENET employee agreement(s). If Consultant resigns from EXENET, he/she will be entitled to full commissions due up to and including the date of resignation. Any commissions paid at time of invoice shall be settled with sixty (60) days of date of termination, and commission on unpaid invoices shall be paid back to the company.

Nothing in this document implies an employment relationship, beyond employment-at-will, between EXENET and the Consultant.

### Account Transfers

EXENET management may transfer an account from one Consultant to another as part of a Territory shift and/or to ensure better coverage of a Territory. If such a transfer were to take place, management may choose one of the following options:

- Consultant pursues specified opportunities for a period of three (3) months, during which time Consultant will be credited for any booked business associated with the specified opportunities;

OR

- If Consultant is no longer active in the account, for qualified opportunities at S or D stage (per Solution Selling methodology), 20% of the commissions for revenue generated within three (3) months of transfer. For a qualified client at C stage and beyond, 50% of commissions for revenue generated within six (6) months of transfer.

Proprietary & Confidential
EXENET LLC

## Shared Accounts

Consultant may work on opportunities with other Consultant or senior management of EXENET. In such cases, commissions may be split based on an agreement among all parties involved with the specific opportunity. A split arrangement shall be documented and will require the approval of the President. All such arrangements shall be forwarded to Accounting after approval of the President.

## House Accounts

EXENET reserves the right to retain an opportunity or account to be managed by employees other than a Consultant.   An Opportunity identified as such is referred to as a House Account. EXENET will make best efforts to identify these Opportunities early in the sales cycle.  If an Opportunity is chosen as a House Account in a late stage of the sales cycle, the commissions shall be subject to the guidelines outlines under the "Account Transfers" section.

# APPENDIX B

## SIGNING BONUS

Deborah Suss shall be entitled to a Signing Bonus calculated as follows:

- ❖ 5% of Net Services Revenues earned by from the backlog of booked business acquired by EXENET through EXENET's acquisition of the Legal Services Division of CNT

- ❖ Net Services Revenues shall be the net service revenues earned by EXENET from the backlog of booked business acquired by EXENET through EXENET's acquisition of the Legal Services Division of CNT.  Net Services Revenue shall exclude all payments for freight, taxes and third party fees, charges and/or commissions.

- ❖ Deborah Suss' Signing Bonus has a maximum limit of $40,000.

# APPENDIX C

# DEBORAH SUSS EQUITY PARTICATION PLAN

## Management Equity Plan

Amount Offered            2% Limited equity interest in Exenet Holdings LLC, the parent of Exenet LLC

Vesting period            3 Years

Amount Vested
    1st Anniversary        0.67%
    2nd Anniversary       1.34%
    3rd Anniversary        2.00%

Vesting Anniversary Date     September 18

## Performance Equity Plan

Potential Amount Awarded   2.5% Limited equity interest in Exenet Holdings LLC, the parent of Exenet LLC

Terms of Award          The equity award shall be issued upon achievement of the milestones set forth below:

Milestones

1. Vest 1.0% upon acquired legal services division reaching $900,000 in Net Services Revenues* within 2004

2. Vest 1.5% upon acquired legal services division reaching $2,000,000 in Net Services Revenues within 2005

   If Milestone No. 2 is not satisfied in 2005 then;

3. Vest 1.5% upon acquired legal services division reaching $2,200,000 in Net Services Revenues within 2006.

\* For purposes of the Performance Equity Plan, Net Services Revenues shall be the net service revenues actually received by EXENET. Net Services Revenue shall exclude all payments for freight, taxes and third party fees, charges and/or commissions.